**EDELSBERG LAW, P.A.**
Scott Edelsberg (CA Bar No. 330990)
1925 Century Park East, Suite 1700
Los Angeles, California 90067
Telephone: (305) 975-3320
scott@edelsberglaw.com

*Counsel for Plaintiff and the Putative Class*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JASON SMITH, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> SOFI SECURITIES, LLC, and SOFI TECHNOLOGIES, INC., <br><br> Defendants. | Case No. <br><br> **CLASS ACTION COMPLAINT** <br><br> JURY TRIAL DEMANDED |

Plaintiff Jason Smith ("Plaintiff"), individually and on behalf of all others similarly situated, by and through undersigned counsel, brings this action against Defendants SoFi Securities, LLC ("SoFi Securities") and SoFi Technologies, Inc. ("SoFi Technologies") (collectively, "SoFi" or "Defendants"). Plaintiff alleges the following upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, including review and analysis of: (a) documents created and distributed by Defendants; (b) account statements, disclosures, and agreements provided to Plaintiff and similarly situated customers; and (c) publicly available information concerning Defendants. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE CASE

1.      A cash sweep account automatically transfers customer cash from a brokerage account to a bank account to earn interest. This case arises from Defendants' exploitative implementation of SoFi's Sweep Program (the "Program"), resulting in the breach of Defendants' fiduciary duties owed to Plaintiff and similarly situated brokerage account customers and their contractual obligations to act in their clients' best interests.

2.      When acting as their customers' agents and fiduciaries, Defendants automatically "swept" uninvested cash balances in their customers' brokerage accounts into interest-bearing deposit accounts at participating program banks ("Program Banks") selected by Defendants through the Program. Because the Program Banks paid far below-market rates of interest—indeed, at times as low as zero percent—Plaintiff and Class members lost significant interest they would have otherwise earned had Defendants swept their cash into accounts or vehicles paying reasonable market rates.

3.      Defendants' own disclosures acknowledged that the Program created conflicts of interest. SoFi's Rate Sheet disclosed that "[t]he interest paid to you cannot exceed the rates SoFi Securities earns under the SoFi Money Sweep Program" and that "[i]f at any time the interest rate paid to you exceeds the rate earned by SoFi Securities, the interest rate paid to you will be reduced to a rate below the rate SoFi Securities earns under the SoFi Money Sweep Program." This structure ensured that SoFi Securities would always retain the lion's share of the economic benefit generated by customers' swept cash.[1]

4.      As of June 5, 2022, Defendants paid an interest rate of 0.0% with an Annual Percentage Yield of 0.0% on all customer balances in the Program—regardless of balance tier. This was not merely a low rate; it was no interest at all. Defendants kept the entirety of the returns generated by customers' cash for themselves, while paying those customers absolutely nothing.

---

[1] *See* SoFi Money Rate Sheet, Rates Effective as of June 5, 2022.

5.     Defendants' rate was set unilaterally by SoFi "in its sole discretion without advance notice" to customers.[2] Customers had no ability to negotiate, contest, or even receive prior notice of rate decisions. This unchecked discretion enabled Defendants to maintain a zero-percent rate even as market interest rates rose dramatically.

6.     The SEC has specifically recognized that "cash sweep programs" are a "common source[] of conflicts of interest."[3] Despite this regulatory warning, Defendants exploited their discretion over the Program to maximize their own financial benefits at the direct expense of their fiduciary customers.

7.     The Program was highly lucrative for Defendants. During the Class Period, the "spread" between the miniscule and/or nonexistent rates passed along to customers and the returns Defendants and the Program Banks earned from customer cash constituted a substantial and undisclosed profit center for Defendants. By paying customers next to nothing on their swept amounts, all while deploying those funds in a rising-rate environment, Defendants captured the entire yield generated by billions in customer deposits.

8.     Comparable brokerages paid substantially higher rates on swept cash. For example, Fidelity swept customers' cash into a money market mutual fund yielding over 3.30%, Vanguard offered yields of 3.04% to 3.62%, and R.W. Baird offered approximately 3.54%. By contrast, Defendants paid a tiny fraction of these market rates, including at times, nothing.

9.     Other metrics—including the federal funds rate, Treasury bill yields, and money market fund returns—further evidence that Defendants' sweep rates were not reasonable. For example, between March 16, 2022, and July 26, 2023 alone, the Federal Reserve announced 11

---

[2] *Id.*

[3] https://www.sec.gov/about/divisions-offices/division-trading-markets/broker-dealers/staff-bulletin-standards-conduct-broker-dealers-investment-advisers-conflicts-interest (last accessed June 5, 2026).

CLASS ACTION COMPLAINT

rate hikes, increasing the federal funds rate from a target range of 0.00%–0.25% to a target range of 5.25%–5.50%. Throughout this period, Defendants' rate remained at or near zero.

10. Defendants breached their fiduciary duties by placing their customers' cash in accounts bearing low or no interest and pocketing the entirety of the unpaid interest as profit.

11. Plaintiff brings this action individually and on behalf of a Class of similarly situated individuals to recover damages arising out of Defendants' violations of the law, and for such other relief as the Court may deem just and proper.

**PARTIES**

12. At all times material hereto, Plaintiff Jason Smith has been a resident and citizen of the State of Florida. Plaintiff maintained a brokerage account with Defendants through the SoFi platform. While Plaintiff was Defendants' customer, the cash held in his account was automatically "swept" into an FDIC-insured deposit account at a Program Bank pursuant to the Program.

13. Defendant SoFi Securities, LLC is a registered broker-dealer organized under the laws of the State of Delaware and headquartered in San Francisco, California. SoFi Securities designed, implemented, operated, and profited from the Program, and owed fiduciary and contractual duties to Plaintiff and the Class in connection with the handling of their cash.

14. Defendant SoFi Technologies, Inc. is a Delaware corporation headquartered in San Francisco, California and is the parent company of SoFi Securities. SoFi Technologies had ultimate authority over, and direct financial benefit from, the Program. Through its network of subsidiaries, SoFi Technologies controls the policies and practices at issue and is a publicly traded company on the NASDAQ exchange.

**JURISDICTION AND VENUE**

15. This Court has jurisdiction over this action under the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. §1332(d), this Court has subject matter jurisdiction because (1) the amount in controversy, exclusive of costs and interest, exceeds the sum of $5,000,000.00, (2) the

CLASS ACTION COMPLAINT

proposed Class is comprised of at least 100 members, and (3) minimal diversity exists between at least one plaintiff or class member and one defendant.

16.     This Court has personal jurisdiction over Defendants because Defendants are headquartered within this District, regularly conduct business and activities in this District, including activities that form the basis for the claims here, and a substantial part of the acts and omissions complained of occurred in this District.

17.     Venue is proper in this District under 28 U.S.C. §1391 because Defendants reside in this District, and a substantial part of the events or omissions giving rise to the claims occurred in this District, including Defendants' design, implementation, and operation of the Program from their San Francisco headquarters.

## FACTUAL BACKGROUND

### A.     Defendants' Customer Relationship

18.     By entering into this relationship with Plaintiff and the putative Class, Defendants assumed fiduciary duties including the duties of loyalty, care, good faith, full disclosure, and prudent management of customer assets.

19.     Defendants' fiduciary duties are further described in Regulation Best Interest ("Reg. BI") under the Securities Exchange Act of 1934, which requires broker-dealers to act in retail customers' best interests, meeting obligations of disclosure, care, conflicts of interest, and compliance.

20.     Upon information and belief, Defendants held themselves out as acting in customers' best interests. Despite these representations, Defendants failed to adhere to this standard throughout the relevant Class Period.

### B.     The Cash Sweep Program

21.     A "sweep program" is a "service provided by a broker or dealer where it offers to its customer the option to automatically transfer free credit balances in the securities account of the customer to either a money market mutual fund product as described in § 270.2a-7 or an

account at a bank whose deposits are insured by the Federal Deposit Insurance Corporation." *See* 17 CFR 240.15c3-3(a)(17).

22. Sweep deposits play a pivotal role as a capital source for banks, empowering them to utilize these deposits for various corporate purposes. This includes activities such as making loans or investing in government securities. The disparity between the interest rate paid and the interest rate earned by a bank on those deposits is commonly referred to as the Net Interest Margin ("NIM").

23. The SEC, in its Staff Bulletin: Standards of Conduct for Broker-Dealers and Investment Advisers: Conflicts of Interest, issued August 3, 2022, emphasized that "cash sweep programs" are a "common source[ ] of conflicts of interest."[4]

24. Under the Program, and upon information and belief, Defendants automatically swept clients' available cash balances—including proceeds from securities sales, dividends, and cash deposits—into interest-bearing deposit accounts at participating Program Banks.

25. The Program was the default cash management vehicle for customer accounts. Defendants chose this program for customers over higher-yielding money market fund alternatives because it generated greater revenue for Defendants. The SoFi Money Rate Sheet explicitly disclosed that the "interest paid to you cannot exceed the rates SoFi Securities earns," confirming that the Program's structure was designed to guarantee a profit to SoFi at the expense of customers.

26. Moreover, SoFi reserved the unilateral right to reduce the rate paid to customers at any time "if at any time the interest rate paid to you exceeds the rate earned by SoFi Securities," ensuring that Defendants would always retain a positive spread on customer cash.

27. As a result, SoFi had a direct financial incentive and conflict of interest in selecting cash sweep options for its customers.

---

[4] *See* n.3.

28. The Program primarily benefited Defendants. Through their operation of the Program, Defendants engaged in self-dealing, creating a profit center that benefits only them, to the financial detriment of their customers.

**C. Defendants Placed Class Members' Cash in Accounts Earning Zero to Low Interest**

29. Defendants breached their fiduciary and contractual duties by failing to negotiate a reasonable interest rate, and at times—any interest rate at all—for their customers' uninvested cash in operating the Program.

30. As their customers' agent and financial intermediary, Defendants were contractually and legally obligated to act in the best interests of their clients. Defendants' practice of paying customers little to nothing while extracting the overwhelming majority of the economic value generated by their cash sweep deposits was against their customers' interests.

31. Upon information and belief, Defendants did not negotiate higher and reasonable rates of interest for their customers' cash sweep deposits. Instead, upon information and belief, Defendants worked in consultation with their Program Banks to set artificially low interest rates, ensuring that the full spread accrued to Defendants and the Program Banks, while customers received next to nothing.

32. This is not by accident. The greater the amount of cash balances maintained under the Program, and the lower the rates of interest paid on these cash balances, the more Defendants benefit. Upon information and belief, based on these adverse incentives, Defendants limited customers to low or zero-percent interest rate, and retained most, if not all, of the yield generated by their cash for themselves.

CLASS ACTION COMPLAINT

**D.     Defendants Promised to Base the Cash Sweep Interest Rate on the Current Interest Rate Environment but Failed to Do So as Interest Rates Increased**

33.     Defendants explain that third party Apex Clearing Corporation ("Apex") handles the mechanics of the cash sweep for Defendants.[5]

34.     Defendants provide their customers with a link to Apex's cash sweep terms and conditions document (the "Terms and Conditions Document").[6] This document is part of Defendants' contract with Plaintiff and the proposed Class.

35.     The Terms and Conditions Document promises "You may earn interest on excess cash balances that Apex sweeps to Program Banks. The interest rate will be based on numerous factors, including the current interest rate environment, and is subject to change without notice."

36.     Defendants repeat that promise in an FAQ page: "Yes, you may earn interest on uninvested cash in your brokerage account that Apex sweeps to the program banks. The interest rate is based on several factors, including the current interest rate environment, and is subject to change without notice."[7]

37.     Defendants breached that promise to Plaintiff and the proposed Class because they failed to base the interest rate that customers received from the cash sweep program on the current interest rate environment.

---

[5]     https://support.sofi.com/hc/en-us/articles/18418252753805-How-does-the-brokerage-cash-sweep-program-work (last accessed June 5, 2026)

[6]     https://live-apexv2-import.pantheonsite.io/wp-content/uploads/2024/05/Apex-FDIC-Insured-Bank-Deposit-Sweep-Program-Terms-and-Conditions.pdf (last accessed June 5, 2026)

[7]     https://support.sofi.com/hc/en-us/articles/18418327877005-Do-I-earn-interest-through-the-brokerage-cash-sweep-program (last accessed June 5, 2026)

**E.      Defendants Failed to Base the Interest Customers Received on the Current Interest Rate Environment**

38.     The rates paid under the Program consistently have been unreasonably low relative to federal benchmark rates since at least 2022.

39.     Federal benchmark interest rates, including the federal funds rate, are an appropriate point of comparison for the reasonableness of Defendants' interest rates. The federal funds rate is the rate banks charge to borrow from each other overnight. As the Board of Governors of the U.S. Federal Reserve System ("Federal Reserve") explains on its website, "[c]hanges in the target range for the federal funds rate influence short-term interest rates for other financial instruments."

40.     For one, the effective federal funds rate rose from a low of nearly zero to a 20-year high of approximately 5.33%, based on the Federal Reserve increasing the target range to 5.25% to 5.50%. For example, between March 16, 2022, and July 26, 2023 alone, the Federal Reserve announced 11 hikes to the federal funds rate, increasing it from a target range of 0.00% to 0.25% to a target range of 5.25% to 5.50%.[8]

41.     In addition to the federal funds rate, the rates paid under the Program have been and remain significantly below several other objective benchmarks of reasonableness, including, by way of example: (a) U.S. Treasury bill rates, and (b) the overnight interest rate at which the Federal Reserve repurchases securities from private banks (i.e., the "repo" rate). Short-term interest rates for these other federal financial instruments experienced steep rate increases in 2022 and 2023, as the Federal Reserve hiked the federal funds rate.

42.     For purposes of illustration, the following charts depict the one-year and three-month Treasury bill rates between 2017 and 2026:

---

[8] Federal Reserve, *Economy at a Glance – Policy Rate* (Jan. 30, 2025), https://www.federalreserve.gov/economy-at-a-glance-policy-rate.htm. (last accessed June 4, 2026)





43.    The repo rate similarly increased together with the federal funds rate beginning in 2022. For purposes of illustration, the following graph depicts the repo rates between 2017 and 2026:

CLASS ACTION COMPLAINT



Source: Federal Reserve Bank of New York via FRED®
Shaded areas indicate U.S. recessions.
fred.stlouisfed.org

44. As depicted above, like other short-term interest rate benchmarks, the repo rate increased alongside the federal funds rate beginning in 2022.

45. Even the sweep programs of competitors, who themselves may have been paying unreasonably low sweep rates, dwarfed the nonexistent sums paid under Defendants' Program. For example, Vanguard offered interest payments of 4.5% in its Cash Sweep Program and Fidelity offered 5%.

46. At year-end 2022, Fidelity paid 2.21% interest on cash balances regardless of tier, and R.W. Baird paid between 1.58% interest (on cash balances up to $1 million) and 3.08% interest (on cash balances above $5 million). By contrast, Defendants at times paid interest rates as low as 0.0%—nothing at all.

47. The federal funds target rate continued to increase in 2023, hitting an effective yield of 5.33% on July 27, 2023. As the federal funds rate increased, so too did Fidelity and R.W. Baird continue to increase the rates they paid on swept cash. Defendants, by contrast, continued to pay close to no interest.

48. SoFi's low to zero-percent interest rate is not only significantly lower than its competitors' rates but also substantially lower than interest rates for money market funds.

11

CLASS ACTION COMPLAINT

Nevertheless, Defendants automatically placed customers into the Program they developed with the low to zero yield that they unilaterally set.

49.    By paying customers virtually nothing through the Program, Defendants did not act in their customers' best interests. Instead, Defendants put their own interests above their customers', making substantial net income revenue at their customers' expense. In so doing, Defendants breached their fiduciary duties.

50.    Plaintiff and the Class had no meaningful ability to avoid the harm caused by the Program. Upon information and belief, the Program was the default and sole sweep vehicle automatically assigned by Defendants. Customers were not offered a choice among competing sweep vehicles at account opening or thereafter.

51.    Defendants made material misrepresentations and omissions concerning the Program because the Program was not operated in a manner consistent with Defendants' obligations to act in their customers' best interests. The disclosures stated that the rate was "variable" and could change, implying the potential for positive returns, when in reality Defendants set and maintained the rate at zero percent even as market rates rose to historic highs.

52.    Defendants' conduct constitutes a continuing course of wrongful conduct that has caused, and continues to cause, harm to Plaintiff and the Class. Each day that Defendants maintain Plaintiff's and the Class's cash in the Program at below-market rates while extracting unreasonable compensation constitutes a separate and continuing breach of Defendants' fiduciary duties, contractual obligations, and the implied covenant of good faith and fair dealing.

F.    **Defendants' Interest Rates to Customers Would Have Been Far Higher If Truly Based on Reasonable Rates in the Current Interest Rate Environment**

53.    Section 4975 of the Internal Revenue Code and ERISA Section 408 place the burden of demonstrating reasonableness on the financial institution. Defendants cannot meet this burden because the interest rate they used in the Program does not meet any definition of a reasonable rate.

54.     Based on its ordinary meaning (using Webster's and Oxford dictionary definitions), "reasonable" is synonymous with "fair." Accordingly, "reasonable" in the valuation context is synonymous with "fair market value" and can be determined using a market approach of comparable instruments. A reasonable rate of interest is the rate that would result in a competitive market under fair market conditions—in other words, an interest rate parties would agree to in an arm's-length transaction where neither party is able to exert market power over the other.

55.     The Organization for Economic Co-Operation and Development ("OECD") guidance for financial transactions states that "in applying the arm's length principle to a financial transaction it is necessary to consider the conditions that independent parties would have agreed to in comparable circumstances."[9]

56.     Fair market value is defined by the IRS as: "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." 26 C.F.R. § 25.2512-1.

57.     IRS regulations define an "arm's-length interest rate" for purposes of assessing transfer pricing between related entities as:

> a rate of interest which was charged, or would have been charged, at the time the indebtedness arose, in independent transactions with or between unrelated parties under similar circumstances. All relevant factors shall be considered, including the principal amount and duration of the loan, the security involved, the credit standing of the borrower, and the interest rate prevailing at the situs of the lender or creditor for comparable loans between unrelated parties.

26 CFR § 1.482-2(a)(2).

58.     Consistent with these common-sense definitions, a reasonable sweep rate is one that takes into account market rates for products in arm's-length transactions, market-based

---

[9]     OECD *Transfer Pricing Guidance on Financial Transactions: Inclusive Framework on BEPS: Actions 4, 8-10* (Feb. 2020), https://perma.cc/TNY9-9GK2 (last accessed June 4, 2026)

CLASS ACTION COMPLAINT

intermediary rates commonly accepted for placing depositor cash with third parties, rates applicable to short-term instruments like repurchase agreements, and other short-term benchmark rates, including the federal funds rate and Treasury bills.

59.    For example, the Department of Labor, which maintains enforcement authority with respect to the prohibited transaction rules in the Internal Revenue Code, provided in granting the exemption a definition of "reasonable rate" that considered a broad range of similar products to bank deposit accounts:

> A "reasonable" rate of interest means a rate of interest determinable by reference to short-term rates available to other customers of the bank, those offered by other banks, those available from money market funds, those applicable to short-term instruments such as repurchase agreements, or by reference to a benchmark such as sovereign short term debt (e.g., in the U.S., treasury bills), all in the jurisdiction where the rate is being evaluated.

https://www.federalregister.gov/documents/2003/06/10/03-14594/grant-of-individual-exemptions-deutsche-bank-ag

60.    Three-month Treasury bills, an instrument the Department of Labor has advised should be considered in determining a reasonable interest rate, rose in yield from 0.046% as of January 1, 2022, to 5.394% as of January 9, 2024. Nevertheless, Defendants paid customers at times as low as 0.0%—not merely a fraction of these rates, but at times literally nothing.

## CLASS ALLEGATIONS

61.    Plaintiff brings this case as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b) on behalf of himself and all others similarly situated defined as follows:

62.    The Class is defined as follows:

> All persons in the United States whose cash was subjected to Defendants' sweep Program during the applicable limitations period.

63.    **Numerosity.** Upon information and belief, there are hundreds of thousands of Class members, if not more, so joinder of all members is impracticable. While the exact number of Class members can only be determined by appropriate discovery, Plaintiff believes that Class members

number in the hundreds of thousands and are geographically dispersed because SoFi operates as a nationwide digital financial services platform with millions of registered users.

64.    **Commonality.** There are many questions of law and fact common to the claims of Plaintiff and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. These common legal and factual questions, each of which may also be certified under Rule 23(c)(4), include the following:

(a) whether Defendants owed fiduciary duties to Plaintiff and the putative Class members in connection with the Program;

(b) whether Defendants breached their fiduciary duties to Plaintiff and the putative Class members in establishing, maintaining, and/or operating the Program;

(c) whether Defendants breached their contract with Plaintiff and the putative Class members regarding the Program, including the implied covenant of good faith and fair dealing;

(d) whether Defendants made material misrepresentations and/or omissions in connection with the Program;

(e) whether Defendants have been unjustly enriched because of the conduct complained of herein;

(f) whether this case may be maintained as a class action under Fed. R. Civ. P. 23;

(g) to what extent Class members are entitled to damages and other monetary relief; and

(h) to what extent Class members are entitled to attorneys' fees and costs.

65.    **Typicality**. Plaintiff's claims are typical of the claims of the Class because he was a customer of Defendants that had his cash balances improperly managed by Defendants through their administration of the Program. Thus, Plaintiff's claims are typical of the claims of the members of the Class as the claims arise from the same course of conduct by Defendants, and the relief sought within the Class is common to the members of each.

66.    **Adequacy.** Plaintiff will fairly and adequately represent and protect the interests of

the other members of the Class. Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the other Class members and have the financial resources to do so. Neither Plaintiff nor his counsel have any interest adverse to those of the other members of the Class.

67.     **Predominance & Superiority.** Absent a class action, most Class members would find the cost of litigating their claims to be prohibitive and would have no effective remedy. The class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants, and promotes consistency and efficiency of adjudication. The damages or other financial detriment suffered by Plaintiff and putative Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for members of the proposed Class to individually seek redress for Defendants' wrongful conduct.

68.     **Final Declaratory or Injunctive Relief.** Defendants have acted and failed to act on grounds generally applicable to Plaintiff and the Class members, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class members, and making injunctive or corresponding declaratory relief appropriate for the Class as a whole.

**FIRST CAUSE OF ACTION**
**BREACH OF FIDUCIARY DUTY**
**(On behalf of Plaintiff and the Class)**

69.     Plaintiff repeats, realleges, and incorporates the allegations in Paragraphs 1–68 by reference as if fully set forth herein.

70.     At all relevant times, Defendants owed fiduciary duties to Plaintiff and the members of the Class in connection with the Program. Such duties independently arose out of: (1) the agency relationship between Defendants, on the one hand, and Plaintiff and the members of

16

CLASS ACTION COMPLAINT

the Class, on the other hand, as to the Program; (2) Defendants' holding and control over beneficial funds that belonged to their customers, related to their cash sweep balances; (3) Defendants' discretion as to the Program and their customers' cash, while acting as their agent; and/or (4) the applicable industry standards, including Reg. BI, FINRA standards, and Defendants' obligations under applicable law.

71.     As fiduciaries to Plaintiff and the Class, Defendants owed them the highest duties of loyalty, candor, due care, and prudence in the services they provided in connection with establishing, maintaining, and/or operating the Program. Moreover, as fiduciaries, Defendants had a continuing duty to act exclusively for the benefit of Plaintiff and the Class in connection with the Program. Defendants also had a continuing duty to obtain informed consent from Plaintiff and the Class regarding the Program, and specifically to make sufficiently detailed disclosures regarding the Program, their role, the role of various related parties, and any conflicts of interest to obtain such informed consent.

72.     Defendants further owed Plaintiff and the Class the fiduciary duty to act in good faith in connection with establishing, maintaining, and/or operating the Program.

73.     Defendants further owed Plaintiff and the Class the duty to charge reasonable fees for their services related to the Program.

74.     Plaintiff and the Class were fully dependent upon Defendants' ability, skill, knowledge, and goodwill with respect to Defendants' Program.

75.     Defendants breached their fiduciary duties by the conduct alleged herein, including by designing, structuring, and/or operating the Program to benefit themselves at the expense of their fiduciary customers, making material misrepresentations and omissions regarding the Program, violating their duty of care, and acting in their own—not their customers'—best interest.

76.     As a direct and proximate consequence of Defendants' conduct as alleged herein, Plaintiff and the Class suffered damages in an amount to be determined at trial and seek disgorgement of any unjust gains of Defendants, as well as all other equitable relief deemed just

and proper.

## SECOND CAUSE OF ACTION
### BREACH OF CONTRACT
### (On behalf of Plaintiff and the Class)

77.    Plaintiff repeats, realleges, and incorporates the allegations in Paragraphs 1–68 by reference as if fully set forth herein.

78.    Defendants' relationship with their customers is governed by written contracts, the terms of which are contained in, and incorporated into, various standardized documents drafted by Defendants.

79.    Defendants undertook acting as agents of the customers regarding all transactions relating to the Program and were thus contractually obligated to obtain for Plaintiff and members of the proposed Class, through such transactions, rates of return on their cash balances that are reasonable and based on the current interest rate environment and to otherwise act in their clients' best interests.

80.    As set forth herein, the rates of return paid to customers on their cash balances—namely, at times, zero percent—were not reasonable, were not based on the current interest rate environment, and Defendants did not act in their clients' best interests. Accordingly, Defendants breached their contracts with Plaintiff and the members of the proposed Class.

81.    Plaintiff and the members of the proposed Class suffered monetary damages because of Defendants' breach of contract.

## THIRD CAUSE OF ACTION
### BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (On behalf of Plaintiff and the Class)

82.    Plaintiff repeats, realleges, and incorporates the allegations in Paragraphs 1–68 by reference as if fully set forth herein.

83.    A covenant of good faith and fair dealing is implied into every contract.

84.    Plaintiff and Class members contracted with Defendants to provide them with brokerage and cash management services pursuant to the customer agreements and related

CLASS ACTION COMPLAINT

disclosures. Under these agreements, Defendants were agents of Plaintiff and Class members and owed them duties to act in their best interests.

85.    These contracts were subject to implied covenants of good faith and fair dealing that all parties would act in good faith and with reasonable efforts to perform their contractual duties, both explicit and implied, and not to impair the rights of other parties to receive the rights, benefits, and reasonable expectations under the contracts. Defendants exercised discretion conferred by the Program in bad faith and in a manner that evaded the spirit of the Program and denied Plaintiff and the Class the expected benefit of their bargain.

86.    Among other things, Defendants used their discretion over the Program— including discretion over the selection of Program Banks, the placement of customer cash, the sweep rates, and the fees retained by Defendants—to credit customers at unreasonably low and zero-percent interest rates while retaining, diverting, or allocating to themselves the entirety of the economic value generated by customers' cash. That rate was far below objective benchmarks, including the federal funds rate, Treasury and repo rates, competitor sweep rates, and money market fund yields, even as those benchmarks rose dramatically.

87.    By operating the Program in this manner, Defendants acted opportunistically and in bad faith, frustrated customers' reasonable expectations, and deprived customers of the principal benefit of the Program and the full benefit of their bargain under the customer agreements.

88.    Plaintiff and Class members fulfilled all the terms and obligations of their contracts, including depositing cash and maintaining accounts with Defendants.

89.    As a result of Defendants' breach of the implied covenant of good faith and fair dealing, Plaintiff and Class members sustained damages in an amount to be determined by this Court, including interest on all liquidated sums.

**FOURTH CAUSE OF ACTION**
**NEGLIGENT MISREPRESENTATION AND OMISSIONS**
**(On behalf of Plaintiff and the Class)**

90.     Plaintiff repeats, realleges, and incorporates the allegations in Paragraphs 1–68 by reference as if fully set forth herein.

91.     Defendants were the agents of customers enrolled in the Program, including Plaintiff and the Class. As agents and fiduciaries, Defendants owed Plaintiff and the Class a duty to act with reasonable care in connection with their cash sweep balances deposited and maintained in the Program.

92.     Defendants negligently made material misrepresentations and omissions concerning the Program, as detailed above. Among other things, the SoFi Money Rate Sheet stated that the interest rate was "variable" and that "interest paid on your Account is earned through the SoFi Money Sweep Program," without disclosing the magnitude of the differential between what Defendants earned and what they paid customers, or the specific compensation retained by Defendants.

93.     In reality, contrary to Defendants' misrepresentations and omissions, Defendants unilaterally decided to pay unreasonably low or zero-percent interest rates to customers, which remained stagnant despite a dramatically rising interest rate environment, and to extract the entirety of the yield generated by customers' swept cash for themselves. Additionally, the Program Disclosures failed to disclose the specific rates the Program Banks were paying to SoFi Securities, the proportion of such payments that Defendants were retaining as fees, or the extent to which Defendants were profiting from the Program.

94.     Plaintiff and the Class justifiably relied on Defendants' misrepresentations and omissions and accordingly deposited and maintained cash balances in the Program to their detriment.

95.     Defendants' material misrepresentations and omissions directly and proximately caused harm to Plaintiff and the members of the Class.

20

CLASS ACTION COMPLAINT

**FIFTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**(On behalf of Plaintiff and the Class)**

96.     Plaintiff repeats, realleges, and incorporates the allegations in Paragraphs 1–68 by reference as if fully set forth herein.

97.     This cause of action is pled in the alternative to the extent it is determined there is no enforceable contract.

98.     Because of Defendants' wrongful conduct as alleged herein, Plaintiff and Class members received low to no interest payments whatsoever on their cash sweep balances, depriving them of the economic value they would have received in a reasonable and fair market.

99.     Because of Defendants' wrongful conduct as alleged herein, Defendants unjustly received a benefit at the expense of Plaintiff and Class members in the form of increased compensation and revenue that belonged to Plaintiff and Class members.

100.     Defendants financially benefited from the unlawful acts alleged herein by paying Plaintiff and the Class zero interest under the Program while retaining virtually the entirety of the yield generated by customers' swept cash for themselves. These unlawful acts caused Plaintiff and the Class to suffer injury and monetary loss.

101.     It would be unjust and inequitable to allow Defendants to retain these wrongfully obtained benefits.

102.     Plaintiff and Class members are entitled to restitution and disgorgement of the benefits unjustly obtained, plus interest, in an amount to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests, individually and on behalf of all others similarly situated, the following relief:

1.     For an order certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, defining the Class as requested herein, appointing Plaintiff as class representative and his counsel as class counsel;

CLASS ACTION COMPLAINT

2. Awarding Plaintiff all economic, monetary, actual, consequential, compensatory, and punitive damages available at law and to be determined by proof;

3. Awarding Plaintiff and the class members appropriate relief, including actual and statutory damages;

4. Awarding Plaintiff's reasonable attorneys' fees, costs, and other litigation expenses;

5. Awarding pre- and post-judgment interest, as allowable by law;

6. For an order enjoining Defendants from continuing to engage in the wrongful acts and practices alleged herein;

7. Declaratory and equitable relief, including restitution and disgorgement;

8. For public injunctive relief as the Court may deem proper; and

9. Awarding such further and other relief as the Court deems just, proper and equitable.

## JURY DEMAND

Plaintiff requests trial by jury of all claims that can be so tried.

Dated: June 5, 2026                Respectfully submitted,

By: */s/ Scott Edelsberg*
**EDELSBERG LAW, P.A.**
Scott Edelsberg, Esq. (CA Bar No. 330990)
Gabriel Mandler (*pro hac vice* forthcoming)
Omer Kremer (*pro hac vice* forthcoming)
1925 Century Park E #1700
Los Angeles, CA 90067
Telephone: 305-975-3320
scott@edelsberglaw.com
gabriel@edelsberglaw.com
omer@edelsberglaw.com

John J. Nelson (SBN 317598)
**MILBERG, PLLC**
280 S. Beverly Drive, Penthouse
Beverly Hills, CA 90212
Telephone: (858) 209-6941
jnelson@milberg.com

Jason T. Dennett (*pro hac vice* forthcoming)
**MILBERG, PLLC**
1700 7th Avenue, Suite 2100

Seattle, WA 98101
Telephone: (516) 515-9124
jdennett@milberg.com

*Counsel for Plaintiff and the Proposed Class*